1              IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF NEW MEXICO

3     _____
                                   )
4     UNITED STATES OF AMERICA,    )    No. 14-CR-01361-001 WJ
                                   )
5              Plaintiff,          )
                                   )    Pete V. Domenici U.S. Courthouse
6        vs.                       )    Bonito Courtroom
                                   )    Albuquerque, New Mexico
7     JOHN NG,                     )    Thursday, August 6, 2015
                                   )    10:01 A.M.
8              Defendant.          )
      _____)

9

10                  TRANSCRIPT OF PROCEEDINGS
                          SENTENCING
11         BEFORE THE HONORABLE WILLIAM P. JOHNSON
                UNITED STATES DISTRICT JUDGE

12

13    APPEARANCES:

14    For the Plaintiff:      HOLLAND KASTRIN
                              AEJEAN CHA
15                            UNITED STATES ATTORNEY'S OFFICE
                              District of New Mexico
16                            Post Office Box 607
                              Albuquerque, New Mexico   87103
17
      For the Defendant:      KARI CONVERSE
18                            FEDERAL PUBLIC DEFENDER
                              District of New Mexico
19                            111 Lomas Blvd., NW, Suite 501
                              Albuquerque, New Mexico  87102
20

21    For U.S. Probation:     ELINA ALEKPEROVA

      Reported by:            MARY K. LOUGHRAN, CRR, RPR, NM CCR #65
22                            United States Court Reporter
                              333 Lomas Boulevard, Northwest
23                            Albuquerque, New Mexico  87102
                              Phone:  (505)348-2334
24
          Proceedings recorded by mechanical stenography; transcript
25    produced by computer.

1   (In Open Court)

2          THE COURT:  Let me call the case of the United States

3   vs. John Ng, 14-CR-1361.

4          MS. KASTRIN:  Good morning, Your Honor.  Holland

5   Kastrin on behalf of the United States.  Together with me at

6   counsel table, or next to me, is Ms. Aejean Cha with the DOJ

7   Civil Rights Division.

8          MS. CHA:  Good morning, Your Honor.

9          THE COURT:  Good morning.

10          MS. CONVERSE:  Good morning, Your Honor.  Kari

11   Converse for Mr. Ng, who is present.

12          We have a plea agreement to proffer to the Court.

13          THE COURT:  All right.  Ms. Converse, have you had

14   sufficient time prior to the commencement of this proceeding to

15   review this plea agreement with Mr. Ng?

16          MS. CONVERSE:  I have, Your Honor.

17          THE COURT:  And is he ready to proceed?

18          MS. KASTRIN:  Yes, Your Honor.

19          THE COURT:  All right.  Mr. Ng, I'm going to ask you,

20   sir, to raise your right hand so you can be placed under oath.

21

22          (JOHN WILLIAM NG SWORN UNDER OATH)

23          MR. GARCIA:  Please state your full name for the

24   record.

25          THE DEFENDANT:  John William Ng.

1          THE COURT:  Mr. Ng, what's your age, sir?

2          THE DEFENDANT:  Sixty.

3          THE COURT:  Your date of birth?

4          THE DEFENDANT:  April 10, 1955.

5          THE COURT:  And in terms of your education level, how

6     far did you go?

7          THE DEFENDANT:  I have an MBA.

8          THE COURT:  An MBA.  And you earned that MBA after

9     earning your bachelor's degree?

10          THE DEFENDANT:  That's correct.

11          THE COURT:  Now, in terms of -- I know that you have

12     been treated for mental illness.  Are you currently taking any

13     medications of any kind that would affect your ability to

14     understand the questions that I'm asking you?

15          THE DEFENDANT:  I'm not taking any medication right

16     now.

17          THE COURT:  All right.  Now, Ms. Converse, I know you

18     have spent considerable time with Mr. Ng throughout this

19     proceeding as his counsel.  Are you satisfied that he is fully

20     competent to enter an informed plea?

21          MS. CONVERSE:  Yes, Your Honor.

22          THE COURT:  Now, Mr. Ng, you indicated you're not

23     currently taking any medications, and I would also assume, am I

24     correct, that you're not under the influence of any kind of

25     alcoholic beverage?

1    THE DEFENDANT:  That's correct.

2    THE COURT:  Okay.  Now, did you receive a -- let's

3    see.  What was this, an Information?

4    MS. KASTRIN:  It's an Indictment, Your Honor.

5    THE COURT:  An Indictment.  Did you receive a copy of

6    the Indictment; that is, the document containing the charges

7    made against you in this case?

8    THE DEFENDANT:  Yes, I did.

9    THE COURT:  And did you talk in detail with your

10   lawyer about the charges that were originally filed against

11   you?

12   THE DEFENDANT:  Honestly, no.  I don't remember.

13   MS. CONVERSE:  We've talked about what you're accused

14   of, and the possible defenses to it.

15   THE COURT:  Yes.  In other words, did you talk with

16   Ms. Converse about what you were accused you?

17   THE DEFENDANT:  Oh, yes.  I thought you were talking

18   about this actual document, which I guess should be one and the

19   same.

20   THE COURT:  Right, they typically are.  So, what she

21   did is, she explained to you the charges against you; right?

22   THE DEFENDANT:  More or less, yes.

23   THE COURT:  And then you all talked about the

24   defenses that you had; correct?

25   THE DEFENDANT:  I believe so.

1    THE COURT:  Okay.  Are you fully satisfied with the

2  legal representation and legal counsel that you've received in

3  this case?

4    THE DEFENDANT:  Yes.

5    THE COURT:  Okay.  Now, I've been handed a document

6  that's entitled plea agreement.  First, on the last page, on

7  Page 10, above where it says "John Ng," is that your signature,

8  sir?

9    THE DEFENDANT:  It should be, yes.

10    THE COURT:  Did you have an opportunity to read and

11  discuss this plea agreement with your lawyer before you signed

12  it?

13    THE DEFENDANT:  Yes.

14    THE COURT:  Okay.  Does this plea agreement

15  represent, in its entirety, whatever agreement you've reached

16  with the Government to resolve this case?

17    THE DEFENDANT:  I believe so.

18    THE COURT:  And part of it is, in other words,

19  whatever promises or assurances were made to you, they're

20  contained in this document; correct?

21    THE DEFENDANT:  Yes.

22    THE COURT:  No one made any kind of oral promise or

23  assurance to you that's not in this document?

24    THE DEFENDANT:  That's correct.

25    THE COURT:  Do you understand the terms of this plea

1   agreement?

2          THE DEFENDANT:  I believe so.

3          THE COURT:  Has anyone tried to force you to plead

4   guilty under this plea agreement?

5          THE DEFENDANT:  No.

6          THE COURT:  Your decision to enter into this plea

7   agreement with the United States, was this a voluntary decision

8   that you made on your own after talking with your lawyer?

9          THE DEFENDANT:  That's correct.

10          THE COURT:  Okay.  Now, this is a misdemeanor, so

11   what I have to do is I have to review with you the maximum

12   penalties under this plea agreement.

13          Do you understand that the term of imprisonment is up

14   to a year?

15          THE DEFENDANT:  Yes.

16          THE COURT:  Do you understand that there could be a

17   fine of up to $100,000 imposed?

18          THE DEFENDANT:  Yes.

19          THE COURT:  Do you also understand -- now, this plea

20   agreement provides for a term of probation; correct?

21          MS. CONVERSE:  Yes, Your Honor.

22          THE COURT:  So the term of probation under the

23   statute, I believe, and Counsel can correct me if I'm wrong,

24   but it ranges from one to five years?

25          MS. KASTRIN:  It's one to four years, Your Honor.

1          THE COURT:  I'm sorry, one to four years.

2          THE DEFENDANT:  Yes, that was explained to me.

3          THE COURT:  Okay.  And also, I have to put in what's

4   called a penalty assessment of $25.  Do you understand that?

5          THE DEFENDANT:  I understand that.

6          THE COURT:  Ms. Converse, are there any restitution

7   issues in this case?

8          MS. CONVERSE:  According to the presentence report,

9   Mr. Hurtado is not requesting restitution.

10          THE COURT:  All right.  Then, sir, do you understand

11   the possible consequences of entering into this plea agreement

12   with the United States?

13          THE DEFENDANT:  I believe so.

14          THE COURT:  Now, in terms of rights, I guess -- if

15   this is a misdemeanor, do we still have a right to a jury

16   trial?

17          MS. KASTRIN:  Because it's a Class A, yes, Your

18   Honor.

19          THE COURT:  All right.  You're giving up certain

20   rights.  First, do you understand that you have an absolute

21   right to plead not guilty to the charges that the Government

22   made against you?

23          THE DEFENDANT:  Yes.

24          THE COURT:  And do you understand that if you

25   maintain your not guilty plea, you would be presumed to be

1  innocent, and then the Government would have to prove your

2  guilt based upon a proof beyond reasonable doubt standard?

3          THE DEFENDANT:  Yes, I understand that.

4          THE COURT:  And do you also understand that if you

5  elected to exercise your right to go to trial, then you would

6  have the right to a trial by jury?

7          THE DEFENDANT:  Yes.

8          THE COURT:  And you would, of course, continue to

9  have the right to have a lawyer assist you in your defense?  Do

10  you understand that?

11          THE DEFENDANT:  Yes.

12          THE COURT:  All right.  Do you also understand that

13  if you elected to exercise your right to go to trial, you would

14  have the right to see and to hear all the witnesses and to have

15  them cross-examined in your defense?

16          THE DEFENDANT:  Yes.

17          THE COURT:  Do you also understand that if you went

18  to trial, you would have the right, yourself, to decline to

19  testify unless you voluntarily elected to do so?

20          THE DEFENDANT:  Yes.

21          THE COURT:  Do you also understand you would have the

22  right to the issuance of subpoenas to compel the attendance of

23  witnesses to testify in your defense?

24          THE DEFENDANT:  Yes.

25          THE COURT:  Do you further understand that if you

1  went to trial and you exercised your right to remain silent and

2  to not testify, or to put on any evidence, that those facts

3  could not be used against you?

4          THE DEFENDANT:  Yes.

5          THE COURT:  Do you further understand that by

6  entering into this plea agreement, and if I accept your plea

7  agreement, then you will have waived or given up your right to

8  a trial?

9          THE DEFENDANT:  That's correct.

10          THE COURT:  And that you will have also waived or

11  given up not only your right to a trial, but those other rights

12  associated with a trial which I just asked you about?

13          THE DEFENDANT:  Yes.

14          THE COURT:  Okay.  Now, the plea agreement is a plea

15  to one count; correct?

16          MS. KASTRIN:  Yes, Your Honor.

17          THE COURT:  And then the other one is going to be

18  dismissed, all right.

19          Now, do you understand that you are pleading to the

20  -- it's a violation under 18 United States Code Section

21  245(b)(2)(C), and that is, by threat of force, willfully

22  intimidating and interfering with a person because of her

23  religion and because she has been enjoying private employment.

24          Now, do you understand that that's the offense you're

25  pleading guilty to?

1        THE DEFENDANT:  Yes.

2        THE COURT:  Okay.  Now, I'm going to, on Page 3 of

3   the plea agreement -- just let me ask Ms. Converse this

4   question.  Did you satisfy yourself that if the matter

5   proceeded to trial, the Government could make a prima facia

6   case on the counts charged?

7        MS. CONVERSE:  Yes, Your Honor.

8        THE COURT:  Mr. Ng, I'm going to read this out loud,

9   and just follow along.  And I'm going to ask you some

10  questions.

11        It says:  "On or about February 8, 2014, in

12  Albuquerque, within the District of New Mexico, I, John Ng,

13  posted anti-Semitic notes on the door of Nosh Jewish

14  Delicatessen & Bakery, a business co-owned by A.T.-Y.  I wrote

15  the notes on self-adhesive U.S. Priority Mail labels issued by

16  the Postal Service."

17        Now, as far as what I read, is that true, sir?

18        THE DEFENDANT:  Yes.

19        THE COURT:  And you admit to those facts?

20        THE DEFENDANT:  Yes.

21        THE COURT:  And then it says, and I'm quoting:  "The

22  notes stated:  'From: The one who has lived with your lies.

23  To: The hypocrites who bullshit the world - kikes.'"

24        Now, did you write that, sir?

25        THE DEFENDANT:  Yes.

1          THE COURT:  And you admit to that?

2          THE DEFENDANT:  Yes.

3          THE COURT:  And then another quote that I'm going to

4    read.  "From: The one you scared for life" --

5          THE DEFENDANT:  Scarred.

6          THE COURT:  Excuse me.  "The one you scarred for life

7    scumbags.  To: The kikes who will die like rats."

8          Now, did you write those words, sir?

9          THE DEFENDANT:  Yes.

10         THE COURT:  And you admit to that?

11         THE DEFENDANT:  Yes.

12         THE COURT:  All right.  And then it goes on to state:

13   "I admit and acknowledge as true that (1) the notes were found

14   by A.T.-Y., who is Jewish; (2) she was frightened by these

15   messages and this fear was reasonable; (3) she reported the

16   threats to local enforcement and to the FBI; (4) after finding

17   the notes she purchased a security camera for Nosh; and (5)

18   when that camera did not work, she installed a fake camera with

19   the hope that it would at least have a deterrent effect.  I

20   also admit that I intentionally posted these notes knowing or

21   in reckless disregard of the fact that a reasonable person

22   would perceive these notes to be threatening."

23         Now, as far as what I read, do you admit to those

24   facts?  Or either, you do not contest them?

25         MS. CONVERSE:  You don't contest.

1          THE DEFENDANT:  I don't contest.

2          THE COURT:  Okay.  Now, this further goes on to

3    state:  "On February 11, 2014, I knowingly and voluntarily

4    engaged in a consensual interview with the FBI.  During this

5    interview, I told them I had a bad history with Jews and told

6    them that I posted the notes outside Nosh."

7          Is that true, sir?

8          THE DEFENDANT:  Well, I never really said I had a bad

9    history with Jews.

10          MS. CONVERSE:  Tell him what you did say.

11          THE DEFENDANT:  I told them that I didn't care for

12    them.  That's what I said.

13          THE COURT:  All right.  And then you told the FBI

14    that you posted the notes?

15          THE DEFENDANT:  Yes, I did admit.

16          THE COURT:  All right.  And then it goes:  "I further

17    admitted that I targeted Nosh because I believed it would be a

18    good location to let as many Jews as possible know that 'they

19    are obnoxious and self-centered' and I wanted 'the Jews to know

20    they are'" -- and I'm quoting here; this is a quote --

21    "'fucking scumbags.'"

22          Did you say that, sir?

23          THE DEFENDANT:  It's possible that I -- that part I

24    don't completely remember.

25          THE COURT:  If the FBI officer said this, you don't

1   contest that; is that right, sir?

2           MS. CONVERSE:  Your Honor, there are aspects of what

3   the FBI has reported he said that he has contested, and we have

4   carefully negotiated language here.  This is a particular thing

5   that he just doesn't remember whether he said it or not.

6           THE COURT:  Right.  So he's not contesting it, then,

7   at this point; right?

8           MS. CONVERSE:  Correct.

9           THE COURT:  Is that right, sir?  What you're saying

10  is, you don't remember saying those words to the FBI, but you

11  may have said them?

12          THE DEFENDANT:  Yes, that I may have said them.

13          THE COURT:  All right.  And then it goes on.  Let's

14  see.  The last paragraph says:  "On March 7, 2014, the FBI

15  arrested me.  At the time, I made knowing and voluntary

16  admissions to posting anti-Semitic notes at Nosh Deli."  And

17  you admit to that, sir?

18          THE DEFENDANT:  No.

19          MS. CONVERSE:  Wait.  You didn't tell them on

20  March 7th that you posted notes?

21          THE DEFENDANT:  No, I never --

22          MS. CONVERSE:  On March 7th, you were arrested, and

23  when you were arrested, you admitted posting notes?

24          THE COURT:  In other words, it's saying that you told

25  the FBI that you posted the notes.

1    THE DEFENDANT:  They just arrested me.  I was in the

2  library, they arrested me, and I said, how can I help you that

3  I couldn't help you before?

4    THE COURT:  Well, let's get to it this way.  As we

5  sit here today, under oath, you're testifying that you did post

6  those notes?

7    THE DEFENDANT:  Oh, yeah, Your Honor.

8    THE COURT:  Okay.

9    MS. KASTRIN:  And we're fine -- that's not necessary

10  to meet the factual basis if the Court doesn't want that in

11  there.

12    THE COURT:  I may just scratch through that last -- I

13  mean, he was arrested --

14    THE DEFENDANT:  They're saying that I said that when

15  they arrested me, and I didn't say anything to that effect.

16    MS. CONVERSE:  He's taking that out.

17    THE COURT:  I'll just take that out.  But you were

18  arrested on March 7th?

19    THE DEFENDANT:  That's correct.

20    THE COURT:  All right.  Then Ms. Kastrin, from the

21  United States' perspective, other than taking the Defendant's

22  plea -- is this to Count 1?

23    MS. KASTRIN:  This is to Count 2 of the Indictment,

24  Your Honor.

25    THE COURT:  Okay, to Count 2.  Is there anything else

1    I need to inquire of Mr. Ng?

2             MS. KASTRIN:  I just want to add a couple of points,

3    just in clean-up from Rule 11.  I want to note that he

4    understands that any statements he makes under oath here today

5    could be --

6             THE COURT:  You know, that's a good point.  And

7    that's a question I forgot to ask you.

8             Do you understand when I placed you under oath that

9    if you were to answer anything I asked you falsely, then you

10   could be prosecuted for perjury?  Do you understand that, sir?

11            THE DEFENDANT:  Yes.

12            THE COURT:  And so everything you've answered today

13   under oath is truthful; is that right, sir?

14            THE DEFENDANT:  That's correct.

15            THE COURT:  Thanks for calling that to my attention.

16            MS. KASTRIN:  I want to note that there is no

17   forfeiture contemplated under this plea agreement.  While this

18   plea agreement is pursuant to Rule 11(c)(1)(C), which means

19   that if the Court were to reject the plea agreement, that he

20   could withdraw his guilty plea, and has a stipulated sentence

21   of one to four years probation, that the Court, nonetheless,

22   would have to consider the Sentencing Guidelines in arriving at

23   the appropriate sentence, and that the plea agreement, itself,

24   does have an appeal waiver in it which requires him to waive

25   the right to appeal his conviction, or any sentence, or to

1  collaterally attack any conviction or any sentence, except on

2  ineffective assistance of counsel, and that also includes

3  specifically waiving any right to appeal based on the intent

4  element within this, which is explicitly laid out in the plea

5  agreement.

6              THE COURT:  So Mr. Ng, do you understand that this

7  plea agreement is what's called an 11(c)(1)(C) plea agreement,

8  and just what that means is, if I accept this plea agreement, I

9  am, myself, agreeing to be bound by the resolution.  Do you

10 understand that?

11             THE DEFENDANT:  Yes, sir.

12             THE COURT:  And that the rules also say, if I didn't

13 accept it, then you would be allowed to withdraw your plea?  Do

14 you understand that?

15             THE DEFENDANT:  And that I would have --

16             THE COURT:  You could then go to trial, if I declined

17 to accept the plea agreement.

18             THE DEFENDANT:  Right.  And then I would have my

19 rights if I were to go to trial?

20             THE COURT:  Right.

21             THE DEFENDANT:  To appeal and ...

22             THE COURT:  Right.  But if I accept it, then I'm

23 agreeing to the resolution that you and the Government

24 negotiated.  Do you understand that?

25             THE DEFENDANT:  Yes, I understand that.

1    THE COURT:  Okay.  Also, Paragraph 14.  I do need to

2 inquire -- normally a defendant, if you were to go to trial, or

3 if you were to just enter a straight-up -- well, if you were to

4 go to trial, or if you're under a straight-up plea and I would

5 impose a sentence, oftentimes you would have the right to

6 appeal either decisions that I made or a jury's verdict.  You

7 would have the right to appeal that to the Tenth Circuit Court

8 of Appeals.

9    Now, what this Paragraph 14 does is, it says if I

10 accept this plea agreement and I sentence you in accordance

11 with the plea agreement, with what you all have agreed to, then

12 you have waived or given up your right to appeal the conviction

13 or the sentence under the Rule 11(c)(1)(C) plea agreement.  Do

14 you understand that?

15    THE DEFENDANT:  Yes, I understand that.

16    THE COURT:  Now, did you and Ms. Converse talk about

17 the United States Sentencing Guidelines and how they may apply

18 to your situation?

19    Well, it's a misdemeanor, though, it's not --

20    MS. CONVERSE:  The Guidelines do apply, Your Honor,

21 since it's a Class A misdemeanor.  And we've extensively

22 discussed this, and we've actually litigated the issue before

23 the Court because the guidelines cover a very broad range of

24 conduct from nonviolent misdemeanors to violent felonies.

25    So, yes, we've discussed it and discussed what the

1  calculation would be in this case, and what arguments there may

2  be why that is an excessive sentence under the facts of this

3  case.

4       THE COURT:  And you agree with what your counsel just

5  said, sir?

6       THE DEFENDANT:  Yes.

7       THE COURT:  Okay.  Did I cover everything?

8       MS. KASTRIN:  That is sufficient, Your Honor.

9       THE COURT:  And Ms. Converse, is there anything from

10  your perspective I need to ask the Defendant that hasn't been

11  asked yet?

12       MS. CONVERSE:  No, Your Honor.

13       THE COURT:  All right.  Then the last thing is, is it

14  Counsels' desire for me to accept this 11(c)(1)(C) plea

15  agreement today?

16       MS. KASTRIN:  Yes, Your Honor.

17       MS. CONVERSE:  Yes, Your Honor.

18       THE COURT:  All right.  Mr. Ng, how do you plead to

19  Count 2 that's covered in this 11(c)(1)(C) plea agreement,

20  guilty or not guilty?

21       THE DEFENDANT:  Guilty.

22       THE COURT:  All right.  It'll be the finding of the

23  Court in the case of the United States vs. John Ng that the

24  Defendant is fully competent and capable of entering an

25  informed plea, that the Defendant is aware of the nature of the

1  charges and the consequences of the plea, and that the plea of

2  guilty, pursuant to this 11(c)(1)(C) plea, is a knowing and

3  voluntary plea supported by an independent basis in fact

4  containing each of the essential elements of the offense.  I

5  will formally accept the 11(c)(1)(C) plea on the record, and

6  the Defendant is now adjudged guilty of the offense to which he

7  just pled guilty.

8         All right.  So now that takes us into the sentencing

9  matters, and I guess as a preliminary matter, Ms. Converse,

10  there was a presentence report that the probation office

11  prepared.  Was that reviewed with Mr. Ng?

12         MS. CONVERSE:  It was, Your Honor.

13         THE COURT:  And then Ms. Kastrin, did you determine

14  whether the victim wished to be heard today?

15         MS. KASTRIN:  If I could inquire momentarily, Your

16  Honor.

17         THE COURT:  Sure.

18         MS. KASTRIN:  Thank you.

19         Could we delay this momentarily and have her speak in

20  a bit if she chooses to?  Is that a possibility?

21         THE COURT:  Sure, that's fine.  Do you need a break,

22  or are you ready to proceed with the sentencing?

23         MS. CONVERSE:  Your Honor, we are ready to proceed.

24         THE COURT:  All right.  Why don't we do this,

25  Ms. Kastrin.  What is the United States' -- well, first, on the

1  plea, I'll note that in accordance with the plea agreement,

2  with the guilty plea to Count 2, Count 1 is dismissed.  So

3  that'll be fine.  I'll sign that.

4         Now, what does the United States wish to state

5  regarding the sentencing?

6         MS. KASTRIN:  The United States filed a sentencing

7  memorandum in this case which sets forth in large part the

8  United States' argument in support of a sentence of four years

9  probation, which would be at the high end of the possible range

10 under the plea agreement.

11        Briefly, just in response to some of the points made

12 in the Defendant's sentencing memorandum, I would just note

13 that in addition to the reasons that were set forth in the

14 United States' sentencing memo, that we believe that while

15 Mr. Ng has commendably accepted responsibility by pleading

16 guilty here today, we do believe that there is still

17 minimization of his crime and that he still does not fully

18 appreciate the impact that his threats had on not only this

19 specific victim and the place of employment, but the broader

20 Jewish community and all supporters of the Jewish community

21 here in Albuquerque and nationally, and that that impact is

22 something that supports a sentence of four years probation as

23 opposed to a lower sentence of one year probation.  Also, and

24 this is just adding into what we put, that his history and

25 characteristics very much support a sentence of four years

1  probation.

2          Whereas when the Court is imposing a custodial

3  sentence, the Court is not supposed to consider rehabilitative

4  needs of the Defendant in determining the length of the

5  sentence, the opposite is true with a noncustodial sentence.

6  The Guidelines, themselves, specifically mandate that the Court

7  consider rehabilitation in determining the length of a

8  noncustodial sentence.

9          Given that a condition here is compliance with mental

10  health care, I think that four years of such compliance is far

11  more likely to create sustained stability and to prevent this

12  from happening again than one year.  We have seen through the

13  competency hearings here what short terms of mental health

14  treatment have done for Mr. Ng, and that is pretty much

15  nothing.  They did not help him to have sustained stability.

16  And so for that reason, we believe that four years is the more

17  appropriate sentence in this case.  Four years of probation, to

18  be specific.

19          THE COURT:  Now, this 11(c)(1)(C) plea agreement, it

20  contemplates probation, and I understand there are some

21  specific reasons for that, but if we were treating it as a

22  custodial sentence, he would have gotten credit for the time

23  that he was in the Bureau of Prisons.  Granted it was at a

24  medical facility, but he was still in custody at that sentence.

25  So he would have served longer than what the Guidelines call

1    for in terms of the time that he spent at the secure custodial

2    BOP medical facility.

3              MS. KASTRIN:  Yes, Your Honor, I agree with that.

4    But that would be relevant if it was a custodial sentence.  I

5    would note that if you look at the statute, itself, the statute

6    recognizes that even a misdemeanor, a misdemeanor, can get five

7    years probation.

8              In writing that, it's also recognizing that if you

9    went with a custodial sentence, it would be a max of one year

10   of prison and a max of one year of supervised release for a

11   combined two years.  Nonetheless, the statute permits up to

12   five years probation.  I would say that that's the recognition

13   of Congress that probation can be longer than any jail term or

14   supervised release, even combined.

15             For that reason, I think the fact that he spent this

16   time for competency reasons, but nonetheless was detained for a

17   lengthy period of time, lengthier than statute for a single

18   count -- mind you, if we went to trial, he could go for two

19   years because of two counts of misdemeanor, if you stack them.

20   But the fact remains that because Congress has recognized that

21   a misdemeanor can get up to five years, that there was no issue

22   with the fact that that is lengthier than the custodial

23   sentence could be.

24             THE COURT:  And then in terms of the objection, there

25   was some issue -- I noticed that the United States and

1  Probation had a disagreement.  But since Count 1 is being

2  dismissed pursuant to the plea agreement, that's a legal issue

3  that is now more or less academic; correct?

4          MS. KASTRIN:  Yes, it is an academic argument.  I

5  just wanted to put on the record for any future case of this

6  nature that the United States does not believe that you can

7  call this a composite harm.  We've given to defense counsel, as

8  well as to Probation, a number of cases that recognize that

9  where the threat itself is the crime and the victim receives it

10 more than once, each time that is a different crime.  I think

11 it's hard to argue that the second or third time that a victim

12 receives a threat, that they're like, oh, this is the same as

13 the first time, it doesn't bother me today.  And that's what

14 these cases recognize, that each time there's a new fear, a new

15 psychological harm, and for that reason they shouldn't group.

16          And I'd also note that there is a different provision

17 in 3D1.2 to which 1.1 is specifically excluded from grouping.

18 So I think that also reflects the Guideline belief that 2A1.1

19 is less likely to have a composite harm and more likely to have

20 separate harm, and for that reason we do believe that they are

21 incorrect in their calculations, and if this had gone to trial,

22 that you would have grouped those counts.

23          But you are correct, it is moot.  It's academic.  You

24 do not need to resolve that at the sentencing here today.  But

25 we do feel that they are incorrect in Paragraph 73.

1          THE COURT:  Okay.  All right, I'll hear from defense

2   counsel now, Ms. Converse.

3          MS. CONVERSE:  Thank you, Your Honor.  This case --

4   if I could, I think that -- do we have this up?  Yes.

5          I took a picture this morning of Mr. -- this is just

6   a portion of the file that involves Mr. Ng's mental health that

7   I have actually made paper copies of.  If there's a question

8   about whether this is a mental health case or not, several

9   accordion folders full of mental health records dating back 18

10  years ought to answer that question.

11         Is it also a hate crime, mutually exclusive?  We

12  didn't file an objection.  We probably wouldn't have won it,

13  had we.  But I think it is interesting that Dr. Durham, in his

14  meeting with Mr. Ng, said he did not appear to have any

15  maleficent or prejudiced cognitions or beliefs towards any

16  specific race, religion or creed.  He would say this stems

17  exclusively from mental illness.

18         He also finds, and the Government does not contest

19  it, that Mr. Ng suffered from a diminished capacity at the

20  time.  Whatever label has been put on his mental illness, it

21  does appear to have a cyclical nature, and it was in an

22  exacerbated stage, or a manic stage, or an intensified stage

23  through the end of 2013 and the start of 2014.

24         I would tend to agree with the prosecution that the

25  impact on the community for this misdemeanor has been

1  extraordinarily large, and it's quite possible that Mr. Ng

2  doesn't yet have the insight to appreciate all of that.  It's

3  the defense's contention that psychotherapy would be the way to

4  accomplish this.  The last sentence of Dr. Durham's evaluation

5  says:  "Evidence clearly supports the combination of

6  psychotropic medications and psychotherapy to be superior than

7  either alone in approving reality testing in patients with a

8  formal thought disorder."  Right now, he's doing quite well

9  without medication.

10        Another thing that I was looking at earlier today

11  when I printed out my list of what medications he's been on and

12  what results have come of it, positive and negative, and that

13  is -- it goes on to Page 16.  There is a lot that's been tried

14  with Mr. Ng.  A lot.  And throughout it, he has continued to

15  have delusional beliefs.  It's only in recent years that Jews

16  have entered the belief system.  Most of his mental illness was

17  against Mercedes Benz executives.  It's our position that

18  mental health counseling and psychotherapy is what's going to

19  help him gain the insight necessary.

20        I also find an interesting synchronicity with

21  Ms. Turtletaub's request that he undergo some sort of

22  sensitivity training, because I just finished reading a book,

23  "The Nightingale," which has a lot to do with Jews in 1942, and

24  I was thinking, I wish John could understand this, could read

25  this and understand it.  I really wish he could.  I don't know

1   if he could.  But I think it's an excellent idea for these

2   things to be brought up with his psychotherapist, and if it

3   would be productive rather than counterproductive for some

4   reason, that he be encouraged to visit a tolerance museum and

5   to read books like "The Nightingale."

6           We believe -- well, obviously probation is a certain

7   type of punishment.  It's not as severe as prison, but it is

8   punishment, and this Court has to weigh how much more

9   punishment to give him -- and you've rightly noted that he's

10  spent a lot of time in prison already -- versus how much

11  monitoring do you want, and reach a balance between these two

12  things.  I would hope that in a period far less than four

13  years, psychotherapy could give him the insight to recognize

14  when he's intensifying or cycling or exacerbating, and to know

15  that this is a time to seek additional psychotherapy, possibly

16  at this point to start taking some medications to calm him

17  down.  But balancing the need between the amount of punishment

18  already inflicted in this case versus the very proper desire to

19  monitor, to make sure nothing further happens.

20          We feel that a period of far less than four years is

21  necessary, and it is our position that you should impose one

22  year of probation.

23          THE COURT:  Now, you reviewed, or you saw -- in terms

24  of standard conditions and special conditions, did you talk

25  with Probation on those?  And I can't recall if there were any

1   specific objections.

2          MS. CONVERSE:  Thank you for reminding me, Your

3   Honor.  There was a concern with the very last special

4   condition.  It's too broad, too vague.  We believe you were in

5   a conference with Ms. Alekperova while we were talking with

6   Mr. Lovato, who we used as a stand-in for that, and we agreed

7   that perhaps changing the last sentence, the last special

8   condition, to add intentional.  "The Defendant must not have

9   any intentional direct or indirect communication or contact

10  with the victim."  That would avoid the issue.

11         The first time he has ever seen Ms. Turtletaub is

12  today.  He will now hopefully remember what she looks like so

13  if he ends up walking into the same restaurant, or crossing her

14  or passing her on the street, he would immediately extricate

15  himself from that situation.

16         And then, to go near or enter the premises where she

17  resides, is employed, attends school or treatment, that would

18  pretty much require her to turn over her home address and her

19  class schedule to him, which obviously is not a good plan, nor

20  does she want to do this.  And "near" is a very ambiguous term.

21  We don't believe it would survive Constitutional scrutiny.

22         We'd suggest, "go within 25 feet of the premises

23  where she is employed."  He doesn't know where she lives, he

24  doesn't know where she attends school, he doesn't know where

25  she receives treatment.  The first clause of that, precluding

1  any intentional direct or indirect contact, would keep him from

2  going near her on purpose wherever she is, and the inclusion of

3  "intentional" and the deletion of locations that he must know

4  where these places are would keep him from being under almost a

5  requirement to leave Albuquerque to avoid accidentally going

6  anywhere where she might live without realizing it.

7          So if I could restate that in more concrete terms, we

8  propose that it read:  "The Defendant must not have any

9  intentional direct or indirect contact or communication with

10  the victim, or go near or enter the premises where the victim

11  is employed."  And that will meet the victim's concerns about

12  him not having any contact with her or going near her.  It will

13  meet Constitutional muster, instead of requiring him to not go

14  places saying, we're not going to tell you where they are, but

15  don't go there.

16          MS. KASTRIN:  Your Honor, I think we need to keep

17  "resides, attends school or treatment."  The intentional

18  addresses her concern that if he claims he was on a street and

19  didn't know where she lived, intentional covers that mistake.

20  But we do believe that it's imperative that there is a

21  condition that prevents him from intentionally going to where

22  the victim lives, or where she is at a class.  If we can show

23  that he intentionally did it, that should be a violation.

24          I don't mind adding the word "intentional."  I don't

25  mind adding the reasonable distance requirement to make it so

1    he can go to other places that are a distance from where Nosh

2    Deli is.  But I also would like to add to that.

3          Right now, the only reason that Mr. Ng is prevented

4    from going to Nosh Deli is because it is her place of

5    employment.  If she were to switch employment and no longer be

6    associated with Nosh, he still needs to not be able to go to

7    Nosh.  So we would like to add the specific restriction that he

8    cannot go to Nosh Deli in addition, whether or not that's where

9    she is employed or not.

10          MS. CONVERSE:  No objection to that.  We would like

11   to define "near" as 25 feet.  We discussed that with

12   Mr. Lovato, and that's probably reasonable.

13          THE COURT:  Do you object to that?

14          MS. KASTRIN:  No, I do not.

15          THE COURT:  All right.

16          The other thing I was -- did I understand that Mr. Ng

17   has been accepted at the Wilson Residential, is it a mental

18   health facility?  A mental treatment facility?

19          MS. CONVERSE:  He has, Your Honor.  The description

20   of that facility is the last attachment to our sentencing

21   memorandum.  We have the address, and I have it written down on

22   the back of the addendum.  Here we go.

23          It's a place very near Rio Rancho in northwestern

24   Albuquerque.  The address is 10339 Rio Los Pinos, which is

25   actually probably Rio Los Pinos, Northwest.

1    THE COURT:  And I was going to -- in light of his

2  affirmative steps to get into this residential treatment

3  facility, which I think makes a lot of sense, I was going to

4  add that as a condition.  That would be similar to what's often

5  the inpatient kind of facilities, that he reside at and

6  complete the treatment program at the Wilson Residential

7  Treatment Facility.  Is there any objection to that?

8    MS. KASTRIN:  No, Your Honor.

9    MS. CONVERSE:  No, Your Honor.  Thank you.

10    THE COURT:  All right.  Did Mr. Ng wish to say

11  anything?

12    MS. KASTRIN:  Your Honor, briefly, I did want to

13  advise the Court that Ms. Turtletaub-Young would like to speak

14  to the Court, to the extent that you would want to do that

15  prior to Mr. Ng speaking.

16    THE COURT:  Sure.  Why don't we do this, then.

17  Ms. Converse, you and Mr. Ng have a seat at counsel table, and

18  I'll hear from the victim at this point.

19    MS. KASTRIN:  And she is being escorted by a victim

20  witness, Ms. Mia Terry.

21    THE COURT:  Good morning, ma'am.  If you would, just

22  for the record, state your name.

23    MS. TURTLETAUB-YOUNG:  Alisa Turtletaub-Young.

24    THE COURT:  Ms. Turtletaub, you may proceed.

25    MS. TURTLETAUB-YOUNG:  I'm really nervous, so bear

1   with me.  Sorry.

2          I just want to say that that act and the

3   anti-Semitism had a huge effect, that was already stated on the

4   community, but on myself and my family, on my staff.  I have a

5   12-year-old daughter who asked me, if people ask if she's

6   Jewish, should she lie.  And that should never -- she should

7   never have to be ashamed of who we are.

8          I think that whatever happened to Mr. Ng to cause him

9   such grievances against the Jewish race -- I don't think it

10  should be treated against an entire race.  We've all had

11  grievances with people, and they're personal and it's

12  situational.  It's not an entire race that has harmed you.

13         I have endured anti-Semitism my entire life.  I have

14  been beaten up.  I have had horrible things done to me just

15  because I'm a Jew.  I am very proud to be a Jew, and I'm sure

16  you are very proud of your heritage.

17         I don't think that -- I don't believe that hatred is

18  something that we are born with.  I think it is something that

19  is learned.  The same way that you were smart enough to

20  accomplish an MBA, to learn the skills to master that, you can

21  -- your hatred was obviously something that you learned, and I

22  feel that if you could understand what the Jewish race has gone

23  through, among other races that have experienced genocide,

24  maybe you could unlearn your behavior and maybe you could find

25  kindness in your heart and love in your heart to love everybody

1  for what they are, and not judge based on their race or their

2  religion.

3          I don't feel that whatever illness you have, it

4  doesn't -- stupidity is not an illness, and ignorance is not an

5  illness.  And I hope that you take the time to see what's

6  happening all over the world and to see all the hatred that's

7  in the world, and maybe start with yourself and be a change

8  that we would all like to see.  It starts with one person.

9  That's all I have to say.

10         THE COURT:  Thank you, ma'am.

11         MS. CONVERSE:  You have an opportunity to talk to the

12  Judge, to apologize to the Judge and Ms. Turtletaub.

13         THE DEFENDANT:  I would just like to apologize to Ms.

14  -- I'm sorry.

15         MS. CONVERSE:  Turtletaub.

16         THE DEFENDANT:  Ms. Turtletaub.  My intentions were

17  not to try to threaten or scare anyone.  Unfortunately, I had a

18  bad experience, maybe a few of them, and I expressed something

19  that I shouldn't have.

20         But, again, I wasn't trying to scare.  I guess maybe

21  I went too far and claimed it was the Jewish race.  But I

22  guess, you know, after having some experiences, that I guess I

23  learned to develop this so-called dislike, you know.  I don't

24  want to use hatred, because I'm not really a hating person.  I

25  would never think of trying to hurt someone, injure someone,

1   murder someone.

2          And I apologize to the community.  I don't think they

3   should have a problem, because I don't intend to stalk or

4   pursue anyone, as I told the FBI.  I don't go on the internet

5   looking up Neo-Nazi websites.  I just -- as I told them, I've

6   had some experiences that I guess affected me where I learned

7   to, I guess, dislike them.

8          But, again, I apologize.  I didn't mean to try to

9   threaten or scare them.  I was, I guess, trying to voice my

10  opinion.

11         THE COURT:  Anything else, Ms. Converse?

12         MS. CONVERSE:  No, Your Honor.  Thank you.

13         THE COURT:  All right.  I'll adopt the presentence

14  report's factual findings.  I've considered the Sentencing

15  Guideline applications, the sentencing factors of 18 U.S.C.

16  3553(a)(1)-(7).

17         The offense level is 11, and the criminal history

18  category is 1.  The normal sentencing guideline range would be

19  eight to twelve months.  However, the parties entered into a

20  Rule 11(c)(1)(C) plea agreement, and I'll accept the plea

21  agreement.  It includes a range of one to four years probation.

22  I'll find that the agreed sentence is justified, and I'll also

23  note that part of my decision in accepting this plea agreement,

24  again, is taking into account the length of time that Mr. Ng

25  spent in the custody of the Bureau of Prisons while he was

1    undergoing mental health treatment and evaluation.

2          This case involved a situation where the Defendant

3    posted very anti-Semitic remarks on or around the Nosh Jewish

4    Delicatessen in Albuquerque, New Mexico.

5          Now, one of the things -- I'm encouraged, Mr. Ng,

6    that you're going to do this residential treatment facility at

7    the Wilson facility, because your counsel showed the slide of

8    all the files.  I think if you can get your mental health

9    issues under control, it'll add some quality of life for your

10   benefit.

11         And I heard your remarks that you made about, you

12   didn't mean to offend anybody.  It kind of reminded me a little

13   bit of cases where I've had a bank robber who had a toy gun

14   when he robbed the bank.  But the female teller couldn't tell

15   it was a toy gun, so the impact that the robbery had with the

16   toy gun on the female teller, it was the same impact as if the

17   gun had been a real gun and it had been loaded.  And I think

18   that's part of what I -- from Ms. Turtletaub's perspective and

19   the other people in the Jewish community here in Albuquerque,

20   your notes and the fact that maybe you've had a history of

21   mental illness, the impact on them is the same.  It was a

22   horrible impact on them regardless that you didn't mean it to

23   have the effect that it did.

24         Now, again, I think part of this is -- I remember the

25   testimony of your sister.  You have some family members here

1   who are concerned about you.  I'm going to impose a term of

2   probation of four years, but I'm going to suggest to Probation

3   that if Mr. Ng is doing well and he is following his treatment

4   recommendation and he's not relapsing, that that term may be

5   considered for early release.  But I think it would be to his

6   benefit, and again, establishing some quality of life for him,

7   if he can get his mental health issues under control such that

8   he can lead a normal and functioning life.  And that may mean

9   taking medication, it may mean continued treatment.

10          But I think, again, given the lengthy history of

11  mental illness and its impact on Mr. Ng in terms of his losing

12  his job at Mercedes Benz, and just there's a long history, so

13  I'm going to impose four years.  But again, Probation, if he's

14  doing well, then certainly I would consider and favorably

15  receive a recommendation from Probation for early release.

16          MS. ALEKPEROVA:  Yes, your Honor.

17          THE COURT:  Now, there are standard conditions of

18  supervision that apply.  In terms of special conditions, the

19  Defendant must not possess a firearm, ammunition, destruction

20  device or any other dangerous weapon.

21          Also, I'm going to impose the inpatient condition.

22  Since the Defendant has been accepted at the Wilson Residential

23  Treatment Facility, it'll be a condition of his probation that

24  he successfully attend and complete the Wilson Residential

25  Treatment Facility, and that he follow-up with any treatment

1   and medication regimen that is prescribed for him by the mental

2   health professionals at the Wilson Treatment Facility.

3          There's also a condition, after the Wilson

4   Residential Treatment Facility, that the Defendant participate

5   in and successfully complete an outpatient mental health

6   treatment program approved by the Probation office.

7          I'm going to impose the condition that if the

8   Defendant is prescribed by the appropriate medical personnel,

9   prescribed psychotropic medications, that he take those

10  medications as directed.  Again, these conditions are imposed

11  based on the Defendant's lengthy history of mental health

12  issues and mental illness.

13         Now, it's a standard condition -- or this will be a

14  special condition, that the Defendant, while he's under

15  probation, that he's required to submit to a search of his

16  person, property or automobile under his control to be

17  conducted in a reasonable manner and at a reasonable time for

18  the purpose of ensuring compliance with these conditions of

19  probation.  The Defendant is required to inform any residents

20  where he's residing that the premises may be subject to a

21  search.

22         The Defendant must not have any intentional direct or

23  indirect contact or communication with the victim, or go within

24  25 feet of the Nosh Deli.  Additionally, while I'm not -- I

25  don't think it's appropriate not to impose this.  Victims

1   should not have to say where a victim resides or attends school

2   or treatment, but it is a standard condition, and I am going to

3   keep the language in here that the Defendant not have any

4   intentional direct or indirect contact or communication with

5   the victim or go within 25 feet of where victim resides, is

6   employed, attends school or treatment.

7          The reason for that is -- and again, I'm assuming

8   that Mr. Ng would not do this, but there are instances where

9   some Defendants will take it upon themselves to do research to

10  find out where a victim resides or is employed.  So it's a

11  standard condition, that language.  I've been imposing that

12  language the entire time I've been here, and I'm going to

13  impose it in this case, as well.

14         Now, there was also -- did we cover all the

15  conditions?  Did I leave out any that Probation is

16  recommending?

17         MS. ALEKPEROVA:  Yes, your Honor, I believe you

18  covered every condition.

19         THE COURT:  All right.  No fine will be imposed in

20  this case based on the Defendant's lack of financial resources.

21  The law does require me to impose a special penalty assessment

22  of $25, and I'm required to state that it's due immediately.

23  And finally, I'll find that pursuant to the plea agreement, the

24  Defendant has waived the right to appeal the sentence.

25         All right, is there anything else that we need to

1    take up on this case today?

2           MS. KASTRIN:  No, Your Honor.

3           MS. CONVERSE:  Just to clarify, your Honor, the

4    condition of no contact and don't go anywhere, is the phrase

5    about going places also going to contain intentionally?

6           THE COURT:  I've been putting this language in here

7    for 14 years.  If you want to appeal it, then appeal it.  But I

8    think I've made it clear, and I'm not going to narrow this down

9    any more.  I added the language of intentional, I put the

10   25 feet restriction, but the rest of it's going to stay.  It's

11   a standard condition.  And if you want to appeal it, then

12   appeal it.

13          MS. CONVERSE:  Your Honor, that's what I was asking,

14   if the intentional part applies to --

15          THE COURT:  Yes, it applies.  It's a term that

16   applies to the entire probation.

17          MS. CONVERSE:  Thank you, Your Honor, for the

18   clarification.

19          THE COURT:  All right, we'll be in recess.

20   (Proceedings adjourned at 10:55 A.M.)

21

22                        *  *  *  *  *

23

24

25

1        IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF NEW MEXICO

3   _____
                            )
4   UNITED STATES OF AMERICA, )
                            )
5            Plaintiff,      )
                            )
6        vs.                )   No. 14-CR-01361-001 WJ
                            )
7   JOHN NG,                )
                            )
8            Defendant.      )
    _____ )

9

10          CERTIFICATE OF OFFICIAL COURT REPORTER

11      I, Mary K. Loughran, CRR, RPR, New Mexico CCR #65, Federal

12  Official Realtime Court Reporter, in and for the United States

13  District Court for the District of New Mexico, do hereby

14  certify that pursuant to Section 753, Title 28, United States

15  Code, that the foregoing is a true and correct transcript of

16  the stenographically reported proceedings held in the

17  above-entitled matter on Thursday, August 6, 2016, and that the

18  transcript page format is in conformance with the regulations

19  of the Judicial Conference of the United States.

20  Dated this 2nd day of September, 2016.

21

22  _____
    MARY K. LOUGHRAN, CRR, RPR, NM CCR #65
23  FEDERAL OFFICIAL COURT REPORTER
    333 Lomas Boulevard, Northwest
24  Albuquerque, New Mexico  87102
    Phone:  (505)348-2334
25  Email:  Mary_Loughran@nmcourt.fed.us